## Case No. 17,752.

### WILLIAMSON et al. v. COLCORD et ux.

[1 Hask. 620;[1] 13 N. B. R. 319.]

District Court, D. Maine. Dec., 1875.

ASSIGNMENT IN BANKRUPTCY — WHAT PASSES — CLAIM UNDER GENEVA AWARD — PAROL GIFT TO WIFE—EFFECT.

1. An assignee in bankruptcy takes the property of the bankrupt, subject to all legal and equitable claims of others.

2. A gift bona fide by parol prior to the Geneva award of a claim for the destruction of a vessel by the Confederate cruiser Florida, if proved, would be upheld in equity against subsequent creditors.

3. A parol promise, by a husband to his wife for love and affection to make such gift, does not work a gift and cannot be enforced.

4. A claim for the destruction of a vessel by a Confederate cruiser passes to an assignee in bankruptcy.

[Cited in Re Gallagher, Case No. 5,192.]

[Cited in Leonard v. Nye, 125 Mass. 463.]

In equity. Bill by [Joseph Williamson and others] the assignees of a bankrupt against [Josiah A. Colcord] the bankrupt and his wife, seeking to have a claim of the bankrupt, for the destruction of his vessel by the Confederate cruiser Florida, about to be paid from the fund arising from the Geneva award to the wife on her petition, adjudged to be a part of the bankrupt's estate that passed to his assignees. The respondents answered that in September, 1863, after the destruction of his vessel in March of that year, the bankrupt, having no creditors, actuated by love and affection, gave the claim to his wife, and that it thereby became her separate property and did not pass to his assignees in bankruptcy. Replication was made and proofs were taken.

Thomas B. Reed, for orators.

Clarence Hale, for respondents.

FOX, District Judge. This cause arises from the depredations committed on our com-

merce by the rebel cruiser Florida in March, 1863. At that time the bankrupt, Josiah A. Colcord of Stockton, in this district, was master and a part owner of the barque M. J. Colcord, which was destroyed by the Florida on the 27th of March while on her voyage from New York to Cape of Good Hope. The interest of said Colcord as master and owner is stated to have been something over $11,000, for the recovery of which sum, under the Geneva award, a petition in behalf of Mrs. Colcord is now pending before the proper tribunal at Washington.

Capt. Colcord, sometime after his return to the United States, became a member of the firm of Colcord, Berry & Co. The firm proved insolvent, and having been adjudged bankrupts, the complainants were chosen and qualified as assignees in bankruptcy of said estate, and they have also filed their petition at Washington for the allowance to them of this claim for damages, for the benefit of said Colcord's estate, and have instituted this bill to have the respective rights and interest in the award, which may be made in this behalf, ascertained and determined between them.

The respondents in their answer allege that in Sept., 1863, Capt. Colcord "in consideration of love and affection and for other good and sufficient considerations did give, assign, transfer and set over to his wife, said Martha J. Colcord, said claim, arising from the loss of said barque, and that he has not since that time had or pretended to have any ownership or control over said claim, but that said Martha J. Colcord has exercised such ownership and control, and has always represented and held herself out as the owner of such claim."

Under the laws of this state, husband and wife may contract directly with each other; but when payment was made for property conveyed to her from the property of her husband, or it was conveyed by him to her, without a valuable consideration paid therefor, it may be taken as the property of her husband to pay his debts contracted before such purchase. Rev. St. 1857, c. 61.

In Mitchell v. Winslow [Case No. 9,673], Mr. Justice Story decided that the assignee takes the property of the bankrupt, subject to all legal and equitable claims of others, and is affected by all the equities which can be urged against the bankrupt. This principle has since been reaffirmed scores of times, by the various courts administering the bankrupt law, including the supreme court of the United States. Cook v. Tullis, 18 Wall. [85 U. S.] 332. And if the bankrupt is estopped, his assignee is also estopped.

In 1863 the bankrupt was free from debt. I am therefore brought to the consideration of this cause, as if the parties were husband and wife, each claiming the benefit of the award, and the rules of equity, which would be applicable, if the case was pending between those parties must govern and control my decision in the present suit.

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

The subject matter of this controversy is of that uncertain and indefinable character, that the researches of neither counsel nor court have discovered any authorities directly applicable, and which are decisive of the questions here presented. The claim was not against a foreign government for indemnity for damages occasioned by its authority, as was the case of Comegys v. Vasse, 1 Pet. [26 U. S.] 193; but it is one degree more remote and contingent, being for recompense for injuries suffered from this rebel cruiser, which, as our government contended, had been permitted, through the negligence of the British authorities, to be constructed and equipped and to depart from British territory to accomplish its piracies, and by reason of such negligence indemnity was demanded from the government of Great Britain for the damages thus inflicted on our commerce.

Our own government was not responsible, and no valid claim could be made upon it for redress by the sufferers. Great Britain had not directly committed or authorized these depredations to be made, and it was only on the ground of her failure to comply with her obligations under the rules of international law, that any redress could be sought against her, for the wrongs thus sustained. It is difficult therefore to imagine a claim of a more precarious nature, wholly dependent on the willingness of Great Britain to acknowledge and make satisfaction for the consequences of her misdoings, or submit the same for decision to the arbitration of others, by which latter court her accountability was subsequently established.

It is claimed that, being of this character not manifested by any evidence whatever of a documentary nature, but the whole claim resting and being in mere expectancy and possibility, it was not susceptible of a donation, and therefore, that there could be no valid gift of the same to Mrs. Colcord by her husband. It is certain that there was nothing in his control or possession, which could be so given and delivered as to constitute, at law, a complete and perfect gift and confer a legal valid title to the donee; but equity recognizes many rights, expectancies and possibilities, as being the subject matter of a gift or transfer, so far as to confer an equitable interest therein, which a court of equity will acknowledge, sustain and protect as sufficient to devest the donor of any rights thereto, provided he has done all that was requisite to perfect and carry out his intentions.

In the light of the authorities referred to and commented upon in White & T. Lead. Cas. [Eq. 307, 308, 343, 344, 3d Am. Ed.],[2] I am inclined to hold that the subject matter of the present controversy was such that equity would sustain and protect the rights and claims of the wife thereto, if all was done that was requisite to accomplish the purpose of the husband to vest the same in his wife.

2 [From 13 N. B. R. 319.

It is necessary therefore to critically examine the evidence and see what was said and done between the parties, at the time of this alleged gift, as it is not claimed, that any writings of any kind were executed by either party, or that there was then or at any subsequent time any symbolical delivery of any thing whatever, either documentary or otherwise.

The answers of both the bankrupt and his wife state, that this transfer was made in consideration of love and affection, and for other good and sufficient considerations; there is no averment, that there was any valuable consideration for the transfer, and although the wife and some of the other witnesses state, that she mentioned at the time, as a reason for the gift, that she had let her husband have some money to go into this barque, it is evident from all the testimony, that whatever he may have received from her was his own property, which had been remitted by him to her for the support of his family, and that the balance which remained unexpended was received and paid out by him on the barque's account; this money, never in any way became her property, and at the argument, her counsel properly abandoned all claim or right thereto in her behalf, and conceded that no advantage or support could be derived therefrom, and that the only consideration for the gift was that growing out of the relation existing between the parties, which, although not, either at law or in equity, deemed a valuable consideration, yet is always recognized both as of a good and meritorious nature.

Captain Colcord in his deposition taken in this case, testifies that in September, 1863, he was offered for his claim twelve per cent. of the amount. That he consulted with his wife in relation to accepting this offer, to which she was much opposed; that she remarked, that as the vessel was named for her, and she had let him have some money to put into the vessel, he had better give it to her; and his further statement is as follows: "I told her that I would give the claim to her cheerfully, and that she was welcome to all she could get from it." On being asked by his counsel to state further what was said, his language was, "I give you cheerfully all the claim, and you are welcome to every dollar you can get for the claim." The difference between these two statements is, that the latter imports a present gift, while the other is rather of a promissory nature of what he would do for her in the future. Mrs. Colcord's statement is substantially in accordance with the latter statement of her husband, and she adds that her two daughters were present in the room at the time, and she said to them, "Girls, remember that your father has given me these claims." The testimony of the daughters, who were then quite young, one who has since married being then only fifteen, substantially agree with the mother's statement, and they also testify that Capt. Colcord frequently

spoke in the family of the claim as his wife's, and would allude jokingly to the large sums she would receive from it.

Opposed to this testimony is the statement of Capt. Colcord in his deposition given before the register, in July, 1873, in which he says "I gave the claim to his wife shortly after the vessel was burnt, but I do not recollect whether it was done in writing or not." The evidence of Mrs. Berry, a sister-in-law of Mrs. Colcord, tends to establish, from the admissions of Mrs. Colcord, that her husband, long subsequently to this alleged gift, undertook to manage and control the disposal of this claim, and that the wife made no objection thereto. Mrs. Berry testifies that at one time Mrs. Colcord told her that her husband had sold the claim; at a subsequent time Mrs. Colcord said that they had had a talk of selling but did not sell. In the last conversation Mrs. C. said that the witness was mistaken about hearing her say that Capt. Colcord had sold the claims positively, that he talked of selling them or had an idea of it. Alexander Staples states in his deposition that Capt. Colcord told him, in the presence of Mrs. Colcord, that he had sold out his claim—sold to Western parties. Mrs. Colcord then said, "You have just owned up," and seemed to express some surprise that he had not told her before.

When we consider the failure of memory of Capt. Colcord, in his not being able in 1873 to remember whether he had or not executed any writing to perfect this gift, and also that his first statement in his deposition was that he told his wife he would give her the claim, and the subsequent admissions of both him and his wife, that he had exercised acts of ownership over it, by claiming that he had sold it, or talked of selling it, it may not be an unreasonable conclusion for the court to draw, from all the evidence, that all that was in fact declared by him at that time was a purpose and intent on his part to give to his wife whatever he might thereafter realize from this claim, and that he was still to retain his control over it, and enforce it in such manner as circumstances might subsequently render proper, and that it was not his intent to cast upon her the whole responsibility of prosecuting and maintaining the claim in the future as might be requisite. All the facts to sustain the claim were peculiarly within his own knowledge, and it would be much less difficult for him to procure the required proof when wanted.

The language then employed, without any great restraint, may be considered of a promissory nature simply, as he first expressed it that he would give the claim to her, instead of an actual present gift, as it is quite evident, the examining counsel understood was important should be established. If the fair import of what then took place was a mere agreement and promise on his part that when he should realize the amount, he would give it to his wife, it would remain simply a promissory arrangement, and would not constitute a complete and perfect gift, and would not be obligatory on him or his assignee in bankruptcy, in a court of equity.

The well known case of Jones v. Lock, 1 Ch. App. 25, is certainly a much stronger one than the present, as establishing a gift. In that case, a father put a check of £900 into the hands of his son, nine months old, saying to his nurse, "Look you here; I give this to baby; it is for himself, and I am going to put it away for him, and will give him a great deal more along with it." His wife said, "Don't let him tear it;" and he answered, "Never mind if he does, it is his own, he may do what he likes with it;" he then took it away, saying to the nurse, "I am going to put this away for my son," and he locked it in his iron safe. Shortly after, he died, and the check was found amongst his effects. It was held by Lord Chancellor Cranworth that there had been no gift to, or valid declaration of trust for the son.

Waiving this view of the evidence, and conceding that the intention of Capt. Colcord at the time was to devest himself of all right of redress which he might have for these losses, and to vest the same in his wife, I am nevertheless of the opinion that as there was no valuable consideration therefor, and no delivery of any written transfer or document of any kind, all resting on mere words on his part; he had not by what then took place perfected and accomplished his purpose; there was still remaining the locus penitentiae, and he might at any time afterwards, before the wife had received the fruits of the intended gift, convey or transfer the same to any other party, or could enforce his claim before the courts created for that purpose, in his own behalf and for his sole benefit, and I think that such right passed to his assignee in bankruptcy.

Where the assignment from its own nature or that of the subject matter assigned does not pass the legal title, it can only be good as an executory contract, and requires the assent of both parties and the support of a consideration. In the present case the only consideration arose from the relation of the parties, husband and wife, which is a good and meritorious, but not a valuable one. Edwards v. Jones, 1 Mylne & C. 226. In Ellis v. Nimmo, Lloyd & G. t. Sugd. 333, Lord Chancellor Sugden held that the meritorious consideration of providing for a child was sufficient to authorize a court of equity to enforce an executory contract for that purpose against the donor; but this decision was subsequently abandoned by him, and was not approved by other equity tribunals, and "it is now the settled law of England that an executory agreement, founded on a meritorious consideration, will not be enforced against the donor." Perry, Trusts, § 86.

"At the present day, it seems to be established that even as against volunteers claiming under the settlor, whether with or with-

out any provision aliunde, a voluntary agreement, whether under seal or not, whether coupled with a valid trust of other property settled at the same time or not, cannot be enforced on the mere ground of meritorious consideration." Lewin, Trusts, 99.

Mr. Perry, in Perry, Trusts, § 109, says: "The tendency in the United States is to sustain and carry into effect an executory trust in favor of a wife or child, founded on a meritorious consideration, if the instrument is under seal, though the rule is not fully established, and perhaps upon thorough consideration would not be acted upon."

Mr. Perry says (section 111): "The courts say, that they will not execute a voluntary, executory agreement, unless it is under seal." He cites in support of this, Kennedy v. Ware, 1 Barr [1 Pa. St.] 445, in which it was decided "that an equitable assignment of a chose in action to a daughter by her father, in consideration of love and affection was void," and Caldwell v. Williams, 1 Bailey, Eq. 175, opinion of Harper, Ch., who says: "Some agreements which are termed voluntary, are executed in this court, when made in favor of a wife or children, but these are always agreements by deed or covenant, agreements under seal, which imports a consideration and renders them valid at law. There is no instance of an agreement being enforced, which is not only voluntary in the equity sense of the word, but is also nudum pactum at law."

In Pennington v. Gittings, 2 Gill & J. 208, it was held, that a mere executory contract cannot be supported on the consideration of love and affection, and a gift under such circumstances cannot be made good in equity. See, also, Dennison v. Goehring, 7 Barr [7 Pa. St.] 175.

[In 1 Lead. Cas. in Eq. 332] [3] the doctrine appears to be, that there must exist a valid and obligatory contract at law, as a preliminary basis to any equitable interference, and then, that equity grants its extraordinary aid, only when there is an actual consideration, valuable or meritorious. When instead of a present gift or transfer, there is a promise or covenant to give, or a mere expression of an intention that the donee shall have that subsequently, which the donor reserves to himself, or keeps within his control or disposition for the time being, the question becomes one of contract, and a consideration becomes essentially necessary to give force to that which would otherwise be an uncompleted gift; hence the assignment of a debt, not sustained by a consideration or by the delivery of the instrument by which the debt is evidenced, will be invalid both at law and equity, unless an instrument of gift be executed and delivered as a substitute for the delivery of the evidence of the debt. Hitch v. Davis, 3 Md. Ch. 266; Whittle v. Skinner, 23 Vt. 534. In the Maryland case there was a meritorious consideration, the alleged gift having been made by the father to the daughter, and sought to be enforced against his estate. In Dilts v. Stevenson, 17 N. J. Eq. 407, the marginal note is: "In equity where a widow seeks to establish a gift from her husband in his lifetime, she must adduce evidence beyond suspicion, and nothing less will do than a clear irrevocable gift, either to some person as trustee, or by some clear and distinct act of his, by which he devested himself of the property, and engaged to hold it as trustee for the separate use of his wife. To constitute a perfect gift, the donor must part with the possession and dominion of the property, and if the thing be a chose in action, the law requires an assignment or some equivalent instrument, and the transfer must be actually executed." This being an imperfect gift, it cannot, to carry out the intention of the parties, be construed as a declaration of trust so as to make the donor a trustee for the donee. This was so decided by Lord Chancellor Lyndhurst in Meek v. Kettlewell, 1 Phil. Ch. 342, and he declares the authorities are conclusive on this question. It is but simple justice to state, that nearly all the authorities on these subjects of voluntary trusts and equitable assignments will be found collected in notes to the cases of Ellison v. Ellison, and Row v. Dawson, 1 Lead. Cas. Eq. 245; 2 Lead. Cas. Eq. 731. They are carefully analyzed by the learned authors, and the court has been greatly assisted in its examination of this cause by their labors. The objection was taken to this transfer that it fell within the provisions of chapter 81 of Acts of 1853 (10 Stat. 170), by which transfers of claims against the United States are made absolutely null and void, unless made and executed in the presence of two witnesses after the allowance of the claim, etc. It is a sufficient answer to this objection that at the time of the alleged transfer there was no claim against the United States to be assigned, and the case here is not within that act. And it has been also decided by the court of claims in Lawrence and Crowell's Case, 8 Ct. Cl. 253, that the purpose of the act must be restricted to matters before the treasury, and not to matters coming within the jurisdiction of other courts. Decree for complainants.